IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN W. MANSON, ) | |
| ) | |
| Petitioner, ) | No. C 12-6043 CRB (PR) |
| ) | |
| vs. ) | ORDER DENYING PETITION |
| ) | FOR A WRIT OF HABEAS |
| RANDY GROUNDS, Warden, ) | CORPUS |
| ) | |
| Respondent. ) | |
| ) | |

Petitioner, a state prisoner at Salinas Valley State Prison, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Santa Clara County Superior Court. For the reasons that follow, the petition will be denied.

**STATEMENT OF THE CASE**

On June 30, 2011, petitioner was sentenced to a term of 45 years to life, after being convicted by a jury of two counts of lewd acts on a child under 14, and one count of forcible lewd acts on a child. The jury found true that petitioner committed a sexual offense against more than one victim. The jury was unable to reach a verdict on two counts of aggravated sexual assault of a child under 14, and one count of forcible lewd acts on a child.

On June 29, 2012, the California Court of Appeal affirmed the judgment of the trial court. That same year, the Supreme Court of California denied review.

On November 28, 2012, petitioner filed the instant federal petition for a writ of habeas corpus under § 2254.

On February 4, 2013, the court found that the petition, liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the order to show cause. Although given an opportunity, petitioner has not filed a traverse.

**STATEMENT OF FACTS**

The California Court of Appeal summarized the facts of the case as follows:

> Defendant was charged by first amended information with three counts of aggravated sexual assault of a child under 14 (§ 269; counts 1-3), three counts of lewd acts on a child under 14 (§ 288, subd. (a); counts 6-8) and two counts of forcible lewd acts on a child (§ 288, subd. (b)(1); counts 4 & 5). The information further alleged that defendant committed sexual offenses against more than one victim within the meaning of section 667.61. The alleged victim of counts 1 through 6 was Stephanie Doe, and the alleged victim of counts 7 and 8 was Sabrina Doe.
>
> Prior to trial, the People moved in limine for admission of expert testimony on [Child Sexual Abuse Accommodation Syndrome] "CSAAS." Defendant moved to exclude CSAAS evidence "for any purpose either in the People's case-in-chief or on rebuttal." Defendant also moved for leave to present "a counter-expert" if the court denied his motion to exclude CSAAS evidence. The court denied defendant's motion to exclude expert testimony regarding CSAAS. However, the court granted defendant's motion for leave to call "a 'counter witness,'" and the court stated that the CALCRIM instruction relating to CSAAS evidence would be given to the jury.
>
> <u>The Prosecution's Case [FN2]</u>
>
>   FN2. Our summary of the prosecution's case relates only to the three counts for which defendant was convicted.
>
> At the time of defendant's May 2011 trial, Stephanie Doe was 15 years old

2

and Sabrina Doe, who is Stephanie's half-sister, was 24 years old. Their mother was 44 years old and defendant, who was a friend of their mother's, and who had a key to their family home, was about eight years younger. Stephanie has known defendant all of her life, and Sabrina has known him since she was about 10 years old. Defendant often babysat Sabrina, Stephanie, and their brother who is three years older than Stephanie. Stephanie testified that "for the most part," she had "a good relationship with" defendant. "He was always nice to me."

Stephanie testified that when she was about five years old, she went on a trip to Legoland and Knott's Berry Farm with her mother, father, brother, Sabrina, and defendant. Defendant had "his own room" and her family had "our own room" at their hotel. At some point on the trip, after a day at Legoland, Stephanie told her mother that she had to go to the bathroom. Defendant said that he would take her. When she came out of the bathroom in the hotel room, defendant came close to her, put one hand down her pants, and touched her vagina and her buttocks for about 30 seconds to a minute. She tried to move away from him but he held her back with his other hand; she felt like she could not get away. When they heard what sounded like Stephanie's mother's voice, defendant stopped what he was doing and they left the hotel room, but nobody was there. They returned to Legoland and had been gone for approximately 10 minutes.

Stephanie further testified that she was six when her family stopped seeing defendant regularly, but her mother did not tell her why. She first "recall [ed]" defendant's molestations of her when she was 10 years old while she was in bible class at school. However, she did not tell anybody about the molestations at that time.

When Stephanie was 14, while she was attending a church camp, she told her group leader that she had been molested by a family friend when she was younger. Stephanie did not disclose any details of the molestations or name the molester, but she said that the group leader was the first person to know about it. The group leader told Stephanie that she should let her parents know. When Stephanie returned home, another camp leader accompanied her and was present when Stephanie disclosed to her mother that defendant had molested her. Stephanie's mother was shocked and started crying; she did not ask Stephanie for any details. The next day, Stephanie's mother took her to file a police report and they were later separately interviewed by Detective Mark Natividad. The detective told Stephanie's mother that he wanted to talk to Sabrina and to Stephanie's brother about defendant, and the detective said that she should not discuss any details about Stephanie's disclosure with them before his interviews.

Stephanie's mother called a family meeting at her home. At the meeting were Stephanie, Sabrina, Sabrina's husband, Stephanie's and Sabrina's mother, their mother's husband (Stephanie's father and Sabrina's stepfather), their brother, and two of Stephanie's church youth leaders. Sabrina and her brother thought it unusual that people other than family members were at the meeting, but they had no idea what the meeting was about. Stephanie's mother said Stephanie had something to say.

3

Stephanie asked if everyone remembered defendant and, before she said anything else, Sabrina ran out of the room saying "no, no, no." After Sabrina left the room, Stephanie said that defendant had molested her, but she did not go into detail.

Sabrina's mother and husband followed Sabrina. Sabrina locked herself in the bathroom and cried. She said, "it's my fault, it's my fault." She continued crying after she came out of the bathroom and her mother asked her if she needed to talk to a detective. Sabrina answered yes, but she did not say anything further. The next day, Sabrina's mother called Detective Natividad.

Sabrina testified that when she was about 10 or 11 years old, while she was still in grammar school, and while her mother and stepfather were having marital problems, she sometimes went with her mother to visit defendant and stay at his parents' house. There, Sabrina slept in a sleeping bag on the floor in an upstairs bedroom in her jeans and a T-shirt. She remembers waking up in the sleeping bag, which was unzipped, being rocked back and forth, and feeling defendant behind her with an erection and with his hand on her stomach. She knew it was defendant because of the way his hand felt. He did not say anything and neither did she; she pretended that she was still asleep. She could not tell if defendant had clothes on. The rocking occurred "for a little while[,] it wasn't just real quick." She did not tell anybody about it, and it happened again each of the "handful" of, or less than five, times she spent the night at defendant's parents' house.

Sabrina also testified that there was a mattress in the living room of her mother's house, and she used to watch television while on it. Sometimes, when defendant later came to the house to babysit when Sabrina's mother and stepfather were gone, defendant wrestled with her on the mattress, during which time he would pin her down on her back, straddle her legs, and press their private parts against each other while he had an erection. Each time he did this, she tried to move away, but he held her down. Sometimes he put his hand over or under her shirt but over her bra and quickly grabbed her breast, or he tried to put his hand on her buttocks as she "squirm[ed]" and tried to push him away. The wrestling incidents occurred at least two to three times a week over a couple years.

Sabrina testified that she did not tell her mother about any of these incidents because she did not know what to say or do, so she kept them to herself. The first person she told about the incidents was Detective Natividad.

Sabrina further testified that she spent a lot of time with defendant when she was between the ages of 10 and 12. Often, just the two of them went to the mall, out to eat, to the store, or to the movies, but there was nothing sexual about their relationship. Defendant did put his arm around her waist or hold her by her hip when they walked around the mall. When she was 13 or 14, her mother "shut[ ] down the family's relationship with" defendant without telling her why. However, the family continued to see him on occasion, such as when defendant and his then girlfriend, now

4

wife, visited Sabrina in the hospital after she had her first child. Sabrina testified that she did not tell defendant on that occasion that she felt that she had been abandoned or deserted by him.

Stephanie's and Sabrina's mother testified that she and Sabrina often spent the night at defendant's parents' house during a three-year stretch when Sabrina was between nine and 11 years old. She remembers that on occasion, defendant would wrestle with her children on the mattress she had in her living room and that he would pin them down on the floor. She testified that the trip to Legoland occurred when Stephanie was five years old. During the trip, they all shared a two-bedroom suite at a Residence Inn that was near Knott's Berry Farm and about an hour away from Legoland, and defendant had one of the bedrooms. There were times when defendant was alone with Stephanie on the trip. In the morning while the family ate breakfast outside the suite, defendant would often take one or more of the children back to the suite before everyone else was finished eating. She remembers that one time defendant took only Stephanie back to the suite while everyone else was still eating breakfast.

Sabrina's mother further testified that some time after the Legoland trip, when Sabrina was 13 or 14, she received a call from a friend whose daughter saw defendant and Sabrina at the mall. The friend told Sabrina's mother that her daughter felt that defendant's and Sabrina's behavior there "was not appropriate." Because Sabrina's mother trusted her friend's judgment, she confronted defendant, but he said that nothing was going on. Defendant stopped coming around as often about that same time. Sabrina's mother had the locks changed on her family home and she no longer let defendant babysit her children, but she did not confront Sabrina with what she had heard.

Stephanie's and Sabrina's brother testified that he looked to defendant as his older brother, and that defendant never molested him. He also testified that he never saw defendant wrestling with Sabrina or anyone else in his parent's home.

Carl Lewis, a licensed private investigator and consultant on child sexual abuse issues, testified as an expert in CSAAS. He testified that CSAAS is not a diagnosis. "It is background information based on observations and experience that provides alternative explanations for the often unexpected and often counterintuitive conditions that often appear" in reported child sexual abuse cases. Lewis had not done any investigation in or interviewed any of the people involved in this case because CSAAS "is not something that can be applied to a particular child or a particular set of facts." Nor can it be used to discern between true and false allegations.

CSAAS explains "that people delay in disclosing and there are some explanations for why they do delay." CSAAS has five basic categories: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, unconvincing disclosure; and retraction. Each of the categories provides an alternative explanation for why children do not immediately come forward with information about a molestation, and not all of the categories may be present in every case.

5

<u>The Defense Case</u>

Marlaina Manson, defendant's wife, testified that she met Sabrina in 2004, at which time Sabrina seemed "kind of standoffish" and "almost like jealous." Defendant had not seen Sabrina in the two years before he and Marlaina saw her in the hospital after she had a baby in 2007. At that time Sabrina said to defendant, "So you, basically what, you come around after two years and now you are just going to abandon us again?" Marlaina encouraged defendant to see Sabrina and her family more often. Just prior to defendant's arrest, Sabrina left a couple voicemails for defendant asking him to do some electrical work for her.

Annette Ermshar, a neuropsychologist and board certified forensic psychologist, testified as an expert in CSAAS and human memory. She testified that infants and children have "a very poor ability to make memories or to remember things." Scientific literature suggests that memories of things that occurred between the ages of three years and six years are unlikely to be reliable memories. However, the consensus is that memories tend to be better for traumatic events than neutral or positive events.

Dr. Ermshar further testified that CSAAS has been "rejected" by the American Psychiatric Association and the American Psychological Association. It is not a diagnostic tool for forensic purposes; it does not tell us whether a reported molestation actually occurred. CSAAS was created to advocate for the treatment of children "who have known unquestioned, uncontested histories of child sexual abuse." It does not consider alternate explanations for a child's behavior. There are other explanations for secrets; helplessness; entrapment; delayed, conflicted, and unconvincing disclosure; and retractions, that may have nothing to do with actual sexual abuse.

<u>People v. Manson</u>, 2012 WL 2520460, * 1-4 (Cal. Ct. App., June 29, 2012).

## DISCUSSION

A.   <u>Standard of Review</u>

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.

Id.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.  In such a case, which applies to several claims petitioner raises here, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.  2003); Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

Petitioner has also presented several unexhausted claims, however the court may deny them of the merits if they are not colorable.  See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (holding that an unexhausted petition may be denied on the merits when it is perfectly clear that the applicant does not raise even a colorable federal claim).

B.   Claims

Petitioner raises two claims for relief under § 2254: (1) there was insufficient evidence to find petitioner guilty of committing a lewd act on Stephanie (Count 4), and (2) the admission of CSAAS evidence violated petitioner's right to due process.  Both claims are without merit.

1.     Sufficiency of the evidence

Petitioner argues that the evidence regarding a forcible lewd act on Stephanie is inherently improbable, and thus insufficient to sustain a conviction.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, see id. at 324.

The Supreme Court has emphasized that "Jackson claims face a high bar in federal habeas proceedings . . ." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. Jackson, 443 U.S. at 324.

The California Court of Appeal denied petitioner's claim:

> "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (People v. Maury (2003) 30 Cal.4th 342, 396.)  "'It is blackletter law that any conflict or contradiction in the evidence, or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the witnesses.  It is well settled in California that one

witness, if believed by the jury, is sufficient to sustain a verdict.'" (People v. Watts (1999) 76 Cal. App. 4th 1250, 1258-1259; see also People v. Cudjo (1993) 6 Cal.4th 585, 608-609.) Reversal is warranted only if it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (People v. Bolin (1998) 18 Cal.4th 297, 331.)

In this case, defendant points to numerous conflicts between Stephanie's testimony and her mother's testimony and the other evidence presented about the family's trip to visit Legoland in order to support his contention that Stephanie's claim that defendant molested her on that trip is demonstrably false. For instance, he points to conflicts in the evidence regarding who proposed the trip, what time of day the family left on the trip, and where the inn the family stayed at was located in relation to Legoland. However, we find that, even with the conflicts and inconsistencies in the evidence that defendant points to, there is ample evidence to support defendant's conviction on count 4.

Stephanie's mother testified that while on that trip, her family and defendant ate breakfast outside their suite. Often, defendant would take one or more of the children back to the suite before their parents were through eating. And, Stephanie's mother recalled one instance where defendant took only Stephanie back to the suite while everybody else was still eating. Stephanie testified that on one occasion while on that trip, defendant took her back to the suite alone, and that after she left the bathroom in the suite, defendant put his hand down her pants and touched her vagina and buttocks. He stopped when they heard what they thought was Stephanie's mother's voice outside the suite. That Stephanie thought that the lewd acts occurred after she and defendant walked to the suite directly from Legoland, yet there was other evidence demonstrating that this was impossible, does not warrant reversal of the judgment. Stephanie's testimony regarding where (in the hotel suite during the family trip to Legoland), when (after defendant had taken her back to the suite alone), and how the actual lewd acts occurred (defendant put his hand down her pants and touched her vagina and buttocks), which was believed by the jury, is not inherently improbable and is sufficient to sustain the jury's verdict. (People v. Watts, supra, 76 Cal.App.4th at pp. 1258-1259; People v. Lee, supra, 51 Cal.4th at p. 632.)

Defendant argues that his case is "akin" to People v. Lang (1974) 11 Cal.3d 134 (Lang). We disagree. In that case, nine-year-old twin sisters both claimed that, in separate incidents in almost identical circumstances at a birthday party for the defendant, he placed them on his lap "in full view of various party-goers," and put his hand in their vaginas for three to five minutes. (Id. at pp. 136-137.) The Supreme Court concluded that an argument that the sexual molestation described by the twin sisters was "physically impossible" and that their testimony was "demonstrably false" had arguable merit. (Id. at p. 139.) "[A] strong argument could have been made that the twins' testimony was inherently improbable and insubstantial" because "[e]ach child, using almost identical words, told of unsuccessfully resisting separate but identical assaults by [the] defendant in the presence of from six to twelve persons, none of whom saw either

10

> assault." (Ibid.) Accordingly, the court found that the defendant had received ineffective assistance of counsel when his former appellate counsel refused to raise an insufficiency-of-the-evidence claim on appeal even though the defendant clearly wanted him to. (Id. at pp. 136, 138-139.)
>
> The forcible lewd acts on Stephanie that she claimed occurred in this case did not have any of the indicia of inherent improbability present in Lang. Her testimony regarding the assault was not almost identical to any other reported assault and did not occur in the presence of other persons who did not see it. The evidence supporting the conviction for forcible lewd acts on Stephanie was sufficient to sustain defendant's conviction on count 4. Reversal of the conviction is not warranted. (People v. Bolin, supra, 18 Cal.4th at p. 331.)

Manson, 2012 WL 2520460, * 5-6.

California Penal Code § 288(b)(1) states, "Any person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony." In subdivision (a), the acts described are any lewd or lascivious act upon any part of the body "of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony."

Based on Stephanie's testimony alone, the state court's decision was reasonable in concluding that any rational trier of fact could have found petitioner guilty beyond a reasonable doubt. Even though there was conflicting testimony regarding the incident with Stephanie, this court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. The state court denial of this claim was not an unreasonable application of Jackson.

   2.   Admission of CSAAS evidence

Petitioner argues that the court erred in admitting evidence regarding CSAAS. Specifically, petitioner argues that the evidence was irrelevant,

11

generally not accepted in the scientific community, and violated his right to due process and a fair trial

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of a fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Only if there are no permissible inferences that the jury may draw from the evidence may its admission violate due process. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Moreover, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

The California Court of Appeal denied petitioner's claim:

> In California, when a defendant suggests that an alleged child sexual abuse victim's conduct is inconsistent with his or her accusations of that abuse, expert testimony on CSAAS has been held admissible to disabuse jurors of commonly held misconceptions about how child sexual abuse victims behave. Noting that other states limit or exclude CSAAS evidence , defendant urges this court to hold that CSAAS testimony is inadmissible as improper, irrelevant expert opinion which usurps the jury's function to determine credibility.
>
> In People v. Perez (2010) 182 Cal. App. 4th 231, this court rejected a similar challenge to the admissibility of CSAAS evidence. We found "no reason to depart from recent precedent, to wit: 'CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony "is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation. [Citations.]'" Moreover, it appears that our Supreme Court reached the same conclusion

> in People v. Brown (2004) 33 Cal.4th 892, 906, in which case we are bound by its reasoning.
>
> In this case, Stephanie and Sabrina testified that they delayed reporting defendant's molestations of them. However, they also both testified that they generally had a good relationship with defendant, that he was always good to them, and that they enjoyed seeing and spending time with him. Therefore, expert testimony on CSAAS was admissible """to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . ." [Citation.]'" The trial court allowed defendant to present expert testimony that CSAAS has not attained scientific acceptance and the court instructed the jury with the pattern instruction on CSAAS evidence. [Footnote omitted.] That the jury was able to critically consider Stephanie's and Sabrina's testimony, and not consider the CSAAS testimony as evidence that defendant committed all of the crimes charged against him, is shown by the fact that the jury found defendant not guilty of two of the charged counts and was unable to reach a verdict on three other counts. Accordingly, any error in the admission of the CSAAS evidence in this case did not constitute prejudicial error. Defendant has not shown a violation of his rights to a fair trial and due process.

Manson, 2012 WL 2520460, * 7 (internal citations omitted).

   The Ninth Circuit has approved of the California Court of Appeal's holding in People v. Patino, 26 Cal. App. 4th 1737 (1994), that the use of CSAAS evidence in a child abuse case does not necessarily offend a defendant's due process rights. Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir. 2003). "[W]e have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." Id.

   Petitioner's claim is foreclosed by Brodit. The Ninth Circuit has upheld the use of CSAAS evidence when, as in the instant case, it is used to show the general characteristics of victims and is not used to opine that a specific child is telling the truth. Moreover, the trial court instructed the jury that CSAAS evidence was not evidence that petitioner committed any of the crimes charged against him, and that the jurors may consider CSAAS evidence only in deciding whether or not Stephanie or Sabrina's conduct was inconsistent with the conduct

13

of persons who have been molested, when assessing their credibility. This use of CSAAS evidence comports with constitutional requirements. In addition, petitioner cites to no clear Supreme Court law that the state court violated or unreasonably applied.

Accordingly, the court denies petitioner's claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:   Feb. 18, 2014

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.12\Manson.C12-6043.hc.wpd